

**CLERK, U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

# ENTERED

**THE DATE OF ENTRY IS ON**
**THE COURT'S DOCKET**

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed April 15, 2025**

_____
**United States Bankruptcy Judge**

_____

### United States Bankruptcy Court
### Northern District of Texas
### Dallas Division

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| Mi Hyun Choi, | § | Case No. 22-30711-swe7 |
| | § | |
| Debtor. | § | |
| | § | |
| | § | |
| | § | |
| New Falls Corporation, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Adv. No. 23-03070-swe |
| | § | |
| Mi Hyun Choi, | § | |
| | § | |
| Defendant. | § | |
| | § | |

1

*Memorandum in Support of Final Judgment*

## I. Introduction

- This is the Court's ruling on the trial in Adversary No. 23-3070.

- These are the Court's findings of fact and conclusions of law pursuant to Rule 52(a)(1) of the Federal Rules of Civil Procedure, made applicable to this Adversary Proceeding by Rule 7052 of the Federal Rules of Bankruptcy Procedure.[1]

- In this adversary proceeding, the Plaintiff New Falls Corporation ("**New Falls**") is seeking a determination that its judgment against the Debtor is non-dischargeable under Bankruptcy Code section 523(a) and that the Debtor should not be granted a discharge at all pursuant to section 727(a).

- The Court has considered the admitted exhibits, the docket in this bankruptcy case and adversary proceeding, and the testimony of the witnesses. The Court has paid close attention to the credibility of each witness, which is crucial in this case.

- Many of the witnesses spoke Korean but little or no English, so the parties used a translator at trial. Even with the logistics of translated testimony, the Court could still determine which witnesses were generally credible and which were not, and which portions of each witness's testimony were credible and which portions were not. No translator was necessary for the Debtor's testimony since she speaks English fluently.

- For the reasons the Court will explain, the Plaintiff proved that the Debtor is not entitled to a discharge under section 727(a). Because the Debtor is not entitled to a discharge, the Plaintiff's section-523 claims will be denied as moot since there is no discharge and thus no debt to except from discharge.

## II. Jurisdiction

- This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This adversary proceeding involves a core matter under 28 U.S.C. § 157(b)(2)(I) and (J). Venue for this adversary proceeding is proper under 28 U.S.C. § 1409(a).

---

[1] The Court originally intended to read these findings of fact and conclusions of law into the record. Due to counsel conflicts in scheduling the ruling, the Court elected to convert the ruling into this less-formal-than-opinion format.

## III.  Factual Background

- The Plaintiff's case touches on a variety of actions taken by the Debtor and her family over several years. The high points can be split into four different categories: the foreclosures, the fraudulent transfers, the transfers of a certain real property, and the Debtor's personal life.

  - First, the Court will give the background of the foreclosures:

    - Before 2015, the Debtor's father, Peter Park, founded Auto Center Unlimited, G.P. ("**Auto Center**"), Super Fiesta, L.P. ("**Fiesta Bazaar**"), and Fiesta Group, L.P. ("**Fiesta Group**" or the "**Event Center**," and all entities collectively, the "**Park Businesses**"). Transcript of Hearing Held 1/6/25 [Docket No. 83] at 143:10–22. The Debtor managed those businesses, and her mom, Sue Park, was the bookkeeper. *Id.* at 143:24–25; Transcript of Hearing Held 1/8/25 [Docket No. 85] at 11:23–25.

    - Because the Parks speak very little English, the Debtor translated for them all English documents related to the businesses, including legal documents such as foreclosure notices and demand letters. Transcript of Hearing Held 1/7/25 [Docket No. 84] at 91:16–22.

    - In May 2006, Mr. Park, on behalf of Auto Center, obtained financing of roughly $1.7 million from United Central Bank ("**UCB**"). Mr. Park personally guaranteed the note. UCB received a deed of trust on the Auto Center property. Amended Joint Pre-Trial Order [Docket No. 60] at 3.

    - At approximately that same time, Mr. Park, on behalf of Fiesta Group, borrowed $2 million from City Bank of Texas secured by a deed of trust on the Fiesta Group-owned property. Mr. Park personally guaranteed the note. Plaintiff Ex. 59 at 196–205.

    - UCB later transferred the Auto Center note and related agreements to ACM United CR, LLC ("**ACM**"). Amended Joint Pre-Trial Order [Docket No. 60] at 3.

    - By 2015, the businesses were struggling financially and were unable to pay ACM or City Bank. *Id.* at 3; Transcript of Hearing Held 1/7/25 [Docket No. 84] at 90:15–23.

- City Bank foreclosed on the Fiesta Group-owned property in July 2015. Amended Joint Pre-Trial Order [Docket No. 60] at 4.

- ACM foreclosed on the Auto Center property in October 2015. In September 2016, ACM obtained a final judgment against Mr. Park and Auto Center for the deficiency of over $933,000. *Id.*

- In February 2019, ACM transferred the rights in the deficiency judgment to the Plaintiff New Falls. *Id.* at 5.

- Fiesta Bazaar's property was also foreclosed upon around the time of the other foreclosures. Transcript of Hearing Held 1/7/25 [Docket No. 84] at 16:1–22.

o Next, the Court will discuss the circumstances surrounding the fraudulent transfers:

- Between 2015 and 2017, Mr. Park borrowed approximately $1.49 million through multiple loans from a man he met at a Korean community meeting named John Chong. *Id.* at 98:25–99:12.

  - The most notable Chong loan was Mr. Park's borrowing of $350,000 from Mr. Chong on July 12, 2015. Amended Joint Pre-Trial Order [Docket No. 60] at 4. Mr. Chong received a deed of trust on property Mr. Park owned in Flower Mound, Texas. Plaintiff Ex. 8. Mr. Park and many other investors also owned a neighboring portion of property through an entity known as Hanmi Realty, Inc. ("**Hanmi Realty**"). Transcript of Hearing Held 1/7/25 [Docket No. 84] at 55:10–15, 102:15–17.

  - Mr. Park deposited the $350,000 check into a joint account at Wilshire Bank that he shared with Mrs. Park and the Debtor (the "**$350,000 Deposit**"). Transcript of Hearing Held 1/6/25 [Docket No. 83] at 155:2–8.

  - On July 14, 2015, merely two days after receiving the money from Mr. Chong, Mr. and Mrs. Park transferred $184,000 from the shared Wilshire account to the Debtor (the "**$184,000 Transfer**"). Amended Joint Pre-Trial Order [Docket No. 60] at 4.

- Mr. Park told Mr. Chong that the loan was needed so the Parks could purchase a condo. No one ever told Mr. Chong that a significant portion of the money he loaned to Mr. Park was given to the Debtor. Transcript of Hearing Held 1/7/25 [Docket No. 84] at 138:19–140:9.

- The parties stipulated before trial that Peter Park did not receive anything in exchange for the $184,000 Transfer. Amended Joint Pre-Trial Order [Docket No. 60] at 4. Still, the Debtor and the Parks insisted at trial that the $184,000 was actually paid on account of the Debtor's work for the Park Businesses. But their stories didn't match up.

  o Sue Park testified that the money was for missed salary payments to the Debtor and was a bonus for all her work over the years for the Park Businesses. Transcript of Hearing Held 1/7/25 [Docket No. 84] at 24:2–17. In addition to testifying about alleged missed salary payments, Peter Park also testified that the money was transferred to compensate the Debtor for the large liability with the State of Texas—discussed later in this ruling—that she accrued when she allowed Club Rio, a tenant of the Event Center, to use her liquor license. *Id.* at 131:23–132:17, 140:4–144:19.

  o The Parks and the Debtor were unable to articulate how many paydays were missed or how they even calculated the total they ultimately transferred. *See id.* at 80:2–5, 81:3–9, 144:20–146:6; Transcript of Hearing Held 1/8/25 [Docket No. 85] at 38:25–41:17. Instead, according to Sue Park, the Debtor was given whatever was left in the three-party Wilshire Bank account after the Parks wrote themselves a $150,000 check to open a new bank account with Shinhan Bank. Transcript of Hearing Held 1/7/25 [Docket No. 84] at 80:2–17.

  o The fumbled attempt by the Debtor and the Parks to characterize the $184,000 as wages undermined their credibility.

5

- The Parks emptied their joint bank account at Wilshire Bank mere months before they were sued by Wilshire Bank for alleged defaults relating to the aforementioned notes and foreclosures. *See* Plaintiff Ex. 59. Ms. Park's testimony that she switched banks because using Wilshire Bank reminded her of the time the Park Businesses were successful and made her sad was not credible. Transcript of Hearing Held 1/7/25 [Docket No. 84] at 27:18–28:15.

- On April 17, 2019, the Plaintiff sued the Debtor and her parents in Texas state court, alleging that the $350,000 Deposit and the $184,000 Transfer were constructive fraudulent transfers under the Texas Uniform Fraudulent Transfer Act. Amended Joint Pre-Trial Order [Docket No. 60] at 6.

  - The parties filed dueling motions for summary judgment; the state court ruled in favor of New Falls, finding that the $350,000 Deposit and the $184,000 Transfer were transfers made for no consideration and were constructive fraudulent transfers.

    o As explained in greater detail later in this ruling, the Debtor's explanations for how she spent the $184,000 are vague and not entirely believable.

  - The state court entered a judgment for New Falls for $350,000 plus interest and attorney's fees. *Id.*

- The evidence at this trial—primarily in connection with the Plaintiff's claims under section 523(a)(2)(A)—indicates that the Parks and the Debtor all actually intended to hinder, delay, and defraud Mr. Park's creditors when the Parks made the $184,000 Transfer.

  - Both the Parks and the Debtor were aware of the Park Businesses' and Mr. Park's dire financial condition and creditors' collection efforts when the $184,000 Transfer was made and received for no consideration, all while Mr. Park was insolvent. The Court need not detail all the badges of fraud that were present for the transfer given that the section-523 claim is moot, but for now it's enough to note that the fraudulent intent of the Parks and the

6

Debtor helps set the stage for the other facts that came to light at trial.

o Next, the Court will discuss the Morgan Property transfers:

- Prior to 2015, Mr. Park owned a parcel of land located at 230 Morgan Avenue, Dallas, Texas (the "**Morgan Property**").

- Sometime in 2010 or 2011, Mr. Park gave the Morgan Property to the Debtor, but according to the Debtor, he took the property back from her when she began having marital and financial problems. Transcript of Hearing Held 1/8/25 [Docket No. 85] at 157:4–10. The Debtor testified that Mr. Park took it back because he wanted to protect it from anyone who could take it from her. *Id.* at 94:23–95:6, 157:4–158:5. This is the first tip-off that Mr. Park exerts great influence over his family members.

- In July 2015—at the same time the Parks made the $184,000 Transfer and City Bank was foreclosing on the Fiesta Group-owned property—Mr. Park transferred the Morgan Property to the Debtor for no consideration. Amended Joint Pre-Trial Order [Docket No. 60] at 5.

- The State of Texas sued the Debtor in April 2016 and ultimately obtained a judgment against her sometime in 2016 or 2017 for $200,000. And what happened to the Morgan Property in that timeframe? In January 2017, the Debtor transferred the Morgan Property to Mr. Jaemin Lee. *Id.*; Plaintiff Ex. 16; Transcript of Hearing Held 1/8/25 [Docket No. 85] at 104:9–107:8.

- The Debtor claims that she borrowed $20,000 from Jaemin Lee to pay gambling debts and transferred Mr. Lee the Morgan Property to satisfy her debt to him because she was otherwise unable to repay the loan. Transcript of Hearing Held 1/8/25 [Docket No. 85] at 97:9–16.

- Who Jaemin Lee is and how he came to be involved with the Debtor are the subjects of conflicting testimony.

  - First, according to the Debtor, who is Korean American, she got to know a Korean lady who was a "big player" at the high-limit table at a casino while gambling. That fellow

gambler allegedly gave the Debtor Jaemin Lee's phone number. *Id.* at 97:17–98:7.

- Mr. Park's story about Jaemin Lee was different and changed during this bankruptcy case. Mr. Park testified in a deposition in this adversary proceeding that Jaemin Lee had done part-time work for Mr. Park's businesses in the past and that's how he obtained Jaemin Lee's telephone number. Transcript of Hearing Held 1/7/25 [Docket No. 84] at 124:11–126:9. At trial, Mr. Park changed his testimony and claimed Jaemin Lee had never worked for him or his businesses and that he was simply mistaken during the deposition. *Id.*

  o When the Court asked Jaemin Lee directly at trial whether he ever worked as a handyman at any property that is in any way associated with Mr. or Mrs. Park, he replied, "No. Maybe not. Because I move around a lot. But as far as I know. I don't -- I don't know." Transcript of Hearing Held 1/6/25 [Docket No. 83] at 128:13–17.

- Jaemin Lee testified that he was introduced to the Debtor through an undocumented and illegal taxi driver named Mr. Chang, who sometimes transports intoxicated people. *Id.* at 122:15–18, 125:19–25, 127:17–20.

- But according to Jaemin Lee, after he told Mr. Chang he could loan money, the Debtor called him directly about the loan. Jaemin Lee testified that he never asked why the Debtor needed a loan; he simply made a $20,000 loan to a stranger (the Debtor) in early-to-mid-2016, purportedly secured by the Morgan Property. *Id.* at 133:4–134:5.

- Jaemin Lee further testified that he received the Morgan Property from the Debtor in January 2017 through a foreclosure because the Debtor was unable to repay the loan. *Id.* at 105:16–106:8, 115:2–12. That story crumbled when the Court started asking questions.

  - When pressed by the Court to explain the foreclosure process, Jaemin Lee professed not to understand how a legal

        foreclosure works, but he knows he received the property through a quitclaim deed. *Id.* at 122:20–123:14; *see* Plaintiff Ex. 16.

- The Debtor, in contrast, testified that she gave Jaemin Lee the Morgan Property outright to satisfy the loan, Transcript of Hearing Held 1/8/25 [Docket No. 85] at 158:22–159:10, a story that conflicts with Jaemin Lee's initial foreclosure testimony.

- Jaemin Lee testified that he was holding the Morgan property as collateral pursuant to a document that he couldn't identify with specificity, other than to note that he didn't file it in the real property records. According to Jaemin Lee, he no longer has the alleged collateral document because he disposed of it. Transcript of Hearing Held 1/6/25 [Docket No. 83] at 138:21–139:25.

- Nobody at trial produced any written documentation of a loan from Jaemin Lee or a supposed deed of trust or other security document on the Morgan Property that Jaemin Lee obtained to secure the loan.

- Jaemin Lee's testimony that he made the Debtor a loan and obtained the Morgan Property through a foreclosure or through some other collateral document was not believable.

- In January 2018, Jaemin Lee transferred the Morgan Property to Eunsong Lee, Mr. Park's niece and the Debtor's cousin. Amended Joint Pre-Trial Order [Docket No. 60] at 5.

  - Mr. Park testified that his niece Eunsong Lee asked him if he had some good land to buy because she has thousands of dollars in her possession to purchase real property. Transcript of Hearing Held 1/7/25 [Docket No. 84] at 125:19–126:9. According to Mr. Park, that is why he gave her Jaemin Lee's telephone number.

    - Mr. Park's testimony that Eunsong Lee asked him—unsolicited—if he had good real estate to buy because she had thousands of dollars to spend on real estate was not credible.

- Although a purchase and sale agreement and a general warranty deed were admitted in evidence, there were no documents in evidence showing that Eunsong Lee actually paid Jaemin Lee $35,000 for the Morgan Property. Transcript of Hearing Held 1/6/25 [Docket No. 83] at 56:23–57:4; Plaintiff Exs. 25, 26.

- Jaemin Lee testified that Eunsong Lee called his cell phone to offer to purchase the property, but he's not sure how she got his phone number, and he wasn't concerned that a total stranger had his cell phone number. Transcript of Hearing Held 1/6/25 [Docket No. 83] at 129:24–130:12.

- The testimony at trial from all witnesses about the alleged purchase was not credible.

  ▪ In July 2022, after the Debtor had filed her bankruptcy petition and while Eunsong Lee was the title owner of the Morgan Property, the Debtor had a coworker list it for sale on an MLS for $652,000. Transcript of Hearing Held 1/8/25 [Docket No. 85] at 85:10–86:25; Plaintiff Ex. 44. The Debtor testified that she did this at her father's suggestion. Transcript of Hearing Held 1/8/25 [Docket No. 85] at 87:1–88:22.

  ▪ On December 12, 2023—the same day the Plaintiff notified Eunsong Lee that it was moving to compel her deposition in the present case—Eunsong Lee transferred the property for no consideration to her sister Eun Joo Jun (another cousin of the Debtor), who is currently the title owner. Transcript of Hearing Held 1/6/25 [Docket No. 83] at 63:2–65:12.

o Next, the Court will note some things about the Debtor's personal life:

  ▪ The Divorce

    - When the Park Businesses shut down in 2015, the Debtor was going through a divorce. Transcript of Hearing Held 1/8/25 [Docket No. 85] at 152:19–22.

    - The Debtor was purportedly given her ex-husband's interest in a janitorial service company, Image Building Maintenance, Inc. ("**Image Building**") in the divorce decree, but it is unclear whether her ex-husband ever had such an

interest. The same goes for the award of her ex-husband's purported interest in Priority1 Building Maintenance LLC ("**Priority1**"). *Id.* at 126:21–128:10. The Plaintiff did not offer the divorce decree into evidence.

- The Debtor claims she knew nothing of the interests until New Falls brought it up in a deposition in this case. *Id.* at 127:10–13.

- Nevertheless, after learning this information, she did not investigate whether the interests existed, and if they did, what they amounted to.

- The Debtor did not list her potential interest in Image Building or Priority1 in her bankruptcy schedules. *See* Plaintiff Ex. 38 at 12.

- Gambling and Other Issues

  - The Debtor purportedly has a long history with gambling.

  - By 2015, according to the Debtor, she had accrued years of gambling debt. Transcript of Hearing Held 1/8/25 [Docket No. 85] at 152:19–25.

  - According to the Debtor, due to her poor decisions during that time, she was unable to pay her property taxes and was forced to borrow money from Propel Financial Services to pay them. *Id.* at 58:14–20; *see* Plaintiff Ex. 54 at 4–7.

  - The Debtor's gambling testimony during the bankruptcy case and this adversary proceeding has been evasive and conflicting.

    o The Debtor testified at her section-341 meeting of creditors that she had not gambled since 2016, but she admitted at a deposition in this adversary proceeding that her section-341-meeting testimony was false. Transcript of Hearing Held 1/8/25 [Docket No. 85] at 107:9–16.

    o At trial, she testified that during her section-341 meeting, she had forgotten about a winter 2019 "per

se free" trip from MGM for a four-night stay at the Bellagio in Las Vegas. *Id.* at 107:21–108:4.

o  According to the Debtor, her original intent was not to gamble, "of course," but to take her kids and mom on a trip and to see shows. Her kids went to a chocolate-fountain store, and while walking through the casinos she just "stuck" money in slot machines. *Id.* at 108:5–17.

o  When asked at trial how much her gambling losses were on the trip, she said, "Actually, out of my pocket, not too much." *Id.* at 108:18–20.

o  But when shown her tax return for the same period, she confessed that her gambling losses were $7,500. *Id.* at 109:8–110:21; *see* Plaintiff Ex. 27 at 17.

o  With that gambling loss in the open, the Debtor testified that she hasn't gambled since that trip, even though she admits she has since taken trips to Winstar and to the Venetian with friends. She claims not to have gambled on those trips, but her testimony was not believable. Transcript of Hearing Held 1/8/25 [Docket No. 85] at 111:4–16.

o  When further pressed by New Falls's counsel, the Debtor suddenly remembered that she has done online gambling since 2022, but she claims that the money she put into it was, "Oh, not -- I mean, not much at all. Like, it may have been like -- like a hundred here or a hundred there, just kind of playing the little slots or the -- whatever they call it." *Id.* at 111:20–112:9.

  ▪  Her answer of "not much at all" sounded an awful lot like her answer to how much she lost gambling during the 2019 Vegas trip—"not too much"—when the losses were actually reported in her tax returns at $7,500.

- o The Debtor's testimony about gambling was generally not credible.

- The Debtor also didn't pay her HOA fees, and in August 2015, the HOA sent the Debtor a notice of assessment of lien on her home. *Id.* at 64:3–65:14; Plaintiff Ex. 54. An additional assessment of lien was placed on her home in December 2015. Transcript of Hearing Held 1/8/25 [Docket No. 85] at 65:2–25; Plaintiff Ex. 54.

  - o According to the Debtor's tax returns, she lived in this home into 2019. Plaintiff Ex. 24 at 1.

- In April 2016, the State of Texas sued the Debtor over failure to pay a sales tax settlement agreement and eventually obtained a judgment against her in 2016 or 2017 for $200,000, as mentioned earlier. Perhaps not coincidentally, around that time is when the Debtor transferred the Morgan Property to Jaemin Lee. Transcript of Hearing Held 1/8/25 [Docket No. 85] at 104:9–107:8.

  - o The suit by the State of Texas stems from the Debtor's allowing Club Rio, a tenant of the Event Center, to use her liquor license to sell alcohol at the facility. *Id.* at 161:23–164:1.

- ▪ The Support Payments

  - In early 2016, the Debtor started a new job in real estate. *Id.* at 66:23–24. A short time later, the Debtor received a real-estate license. The Debtor previously had her real-estate license dating back to 1996 and had extensive experience assisting her father in purchasing real estate. *Id.* at 70:6–71:8.

  - Shortly thereafter, the Debtor began sending money to her parents each month (the "**Support Payments**"). *Id.* at 66:19–21. Between October 2018 and April 2021, the Debtor sent her parents roughly $23,000 at the least. From April 2021 to April 2022 alone, the Debtor gave her parents over $39,000. Amended Joint Pre-Trial Order [Docket No. 60] at 7.

13

- The Debtor did not receive anything from her parents in exchange. The Debtor testified that she gave the money to her parents for support. Transcript of Hearing Held 1/8/25 [Docket No. 85] at 114:1–4, 138:3–12, 155:1–156:21.

- The Debtor continued to send monthly Support Payments after the petition date. *See id.* at 167:17–168:3.

- On the Debtor's tax returns for 2018 through 2022, the Debtor claimed a deduction for costs of labor in the amount of $44,175. Plaintiff Exs. 24 at 7, 27 at 7, 31 at 4, 33 at 8, 36 at 8.

  o However, no one, including Mr. and Mrs. Park, ever worked for or provided services to the Debtor. Transcript of Hearing Held 1/7/25 [Docket No. 84] at 29:21–30:2, 127:10–13.

  o While that deduction is supposed to be for ordinary and necessary business expenses, the Debtor admitted that the returns were false, that no one worked for her during those periods, and that the deduction actually reflected the thousands of dollars each month that she had been giving to her parents for support. Transcript of Hearing Held 1/8/25 [Docket No. 85] at 123:2–25; Amended Joint Pre-Trial Order [Docket No. 60] at 9.

- The Debtor also falsely claimed the Parks as dependents on her tax returns. The parties stipulate that the Debtor did not provide more than half of her parents' support in the years she claimed them as dependents, which is required under the Internal Revenue Code for claiming one as a dependent. Amended Joint Pre-Trial Order [Docket No. 60] at 9; *see* 26 U.S.C. § 152(a)(2), (d)(1)(C).

- The statements in the Debtor's tax returns that the payments to her parents were for labor were intentionally false statements and are troubling.

▪ The Debtor might have had some sort of interest in Trinity River Energy LLC ("**Trinity River**"), an entity with a royalty interest

in an oil-and-gas lease on Mr. Park's property in Flower Mound. Transcript of Hearing Held 1/8/25 [Docket No. 85] at 132:3–133:4.

- The Debtor testified that she had once received a dividend from Trinity River but was unsure whether she still had any sort of interest. *See id.*

- The Debtor did not list her potential interest in Trinity River in her bankruptcy schedules. *See* Plaintiff Ex. 38 at 12.

- The evidence did not indicate when the Debtor did or didn't have an interest in Trinity River or when she ever received any dividends.

## IV.  Procedural Background

- On April 22, 2022, the Debtor filed for relief under Chapter 7 of the Bankruptcy Code.

- On July 31, 2023, New Falls filed this adversary proceeding against the Debtor to both bar her from discharge under section 727, or alternatively, to determine that the Debtor's debt to New Falls should be excepted from discharge under section 523. Complaint Excepting to Dischargeability of Debtor's Debt Owed to New Falls Corporation Pursuant to 11 U.S.C. § 523 and Objecting to Discharge of Debtor Pursuant to 11 U.S.C. § 727 (*Complaint*) [Docket No. 1] at 1.

- Specifically, New Falls asserted counts under sections 523(a)(2)(A), 523(a)(6), 727(a)(2), 727(a)(3), 727(a)(4), and 727(a)(5). *Id.* ¶¶ 84–155.

- The Court held a trial on January 6, 7, and 8, 2025.

- Because the Court finds and concludes that the Debtor is barred from discharge under section 727(a)(5), (a)(4), and (a)(3), the section-523 counts are moot.

## V.  Legal Analysis

*1. The Debtor is barred from discharge under section 727(a)(5) because she failed to explain satisfactorily the depletion of funds received from the $184,000 Transfer and the disposition of the Morgan Property.*

- Objections to discharge are construed strictly against the creditor and liberally in favor of the debtor. *Leyva v. Braziel (In re Braziel)*, 653 B.R. 537, 545 (Bankr. N.D. Tex. 2023).

- New Falls bears the burden of proving the grounds for denial of discharge by a preponderance of the evidence. FED. R. BANKR. P. 4005.

- Section 727(a)(5) bars a debtor from discharge if the debtor fails to "explain satisfactorily . . . any loss of assets or deficiency of assets to meet the debtor's liabilities." 11 U.S.C. § 727(a)(5).

- To prevail, New Falls must first prove that the Debtor once had substantial, identifiable assets that are no longer available to creditors. *Blu Hawk Enters. v. Cournoyer (In re Cournoyer)*, 2023 WL 7179283, at *7 (Bankr. N.D. Tex. Oct. 31, 2023) (citing *Chu v. Texas (In re Chu)*, 679 Fed. Appx. 316, 319 (5th Cir. 2017) (per curiam)).

- If New Falls establishes that the once-existing assets are now unavailable, the burden shifts to the Debtor to provide a satisfactory explanation of the disposition of those assets. *Id.*

- No fraudulent intent on the part of the Debtor is necessary to bar her discharge under section 727(a)(5).

- New Falls contends the Debtor must satisfactorily explain the loss of four substantial, identifiable assets:

    o  (1) the $184,000 she received from Peter Park in the fraudulent transfer;

    o  (2) the Morgan Property;

    o  (3) the $44,000 of income as shown as "Costs of Labor" on her 2019, 2020, and 2021 tax returns; and

    o  (4) the funds that the Debtor used to make the Support Payments. *See Complaint* [Docket No.1] ¶¶ 147–55.

16

- The Court has the discretion to determine what constitutes a satisfactory explanation of a loss. *Kontos v. Manevska (In re Manevska)*, 587 B.R. 517, 539 (Bankr. N.D. Ill. 2018).

- For a debtor's explanation to be "satisfactory," it must consist of more than "vague, indefinite, and uncorroborated" statements of various financial transactions and eliminate any speculation about the disposition of the assets. *In re Cournoyer*, 2023 WL 7179283, at *7.

- If substantial assets have disappeared, supporting documentary evidence must be produced. *Coleman Cnty. State Bank v. Boyd (In re Boyd)*, 2024 WL 557927, at *28 (Bankr. N.D. Tex. Feb. 12, 2024); *Tow v. Henley (In re Henley)*, 480 B.R. 708, 787 (Bankr. S.D. Tex. 2012). The inquiry should not focus on whether the disposition was proper or meritorious, but rather whether the explanation is credible. *H.K. Dev. Corp. v. Dung Anh Phan (In re Dung Anh Phan)*, 607 B.R. 598, 613 (Bankr. S.D. Tex. 2019).

- The Debtor failed to give a satisfactory explanation for her dispositions of the $184,000 Transfer and the Morgan Property. Each disposition alone, without considering the other, is enough to bar the Debtor from discharge under section 727(a)(5).

- An explanation of the circumstances surrounding the dispositions of these assets has been requested by New Falls well before this adversary proceeding.

- The Debtor transferred the Morgan Property to Jaemin Lee more than five years before the bankruptcy petition date and received the $184,000 Transfer nearly seven years prior to the petition date, but the evidence is murky at best on when the Debtor allegedly spent the funds.

- New Falls acknowledges in its complaint that, under section 727(a)(5), a debtor's possession of now-unavailable assets usually must be "not too remote from the bankruptcy petition date." *See Complaint* ¶ 149 (citing *Rutan v. Johns (In re Johns)*, 2023 WL 2412743, at *4 (Bankr. N.D. Tex. Mar. 8, 2023)).

  o But section 727(a)(5) has no enumerated lookback period like other provisions. While courts generally focus a section-727(a)(5) analysis on the two years prior to the bankruptcy filing, they will extend that period for the loss of assets with substantial value. *Vara v. McDonald (In re McDonald)*, 29 F.4th 817, 823 (6th Cir. 2022). "There is no hard and fast rule" for how far a court looks back; it depends on the facts of the case. *Cohen v. Olbur (In re Olbur)*, 314 B.R. 732, 741 (Bankr. N.D. Ill. 2004).

- Under the unique facts of this case—including the Debtor's involvement in the original, actual fraudulent transfer that brought the Debtor the $184,000; her family members' involvement in what appears to be a shell game of moving the Morgan Property away from creditors; and the Debtor's recent involvement in having the Morgan Property listed for sale for over $650,000—the Court concludes that it is more than fair to require the Debtor to provide an adequate explanation for the loss of the $184,000 and the disposition of the Morgan Property. *See, e.g., Lini, Inc. v. Schachter (In re Schachter)*, 214 B.R. 767, 774–75 (Bankr. E.D. Pa. 1997) (looking back seven years for $230,000); *In re McDonald*, 29 F.4th at 821–24 (utilizing a five-year lookback for $204,000); *In re D'Agnese*, 86 F.3d 732, 734 (7th Cir. 1996) (looking back nine years for assets worth more than $300,000).

  - Those valuable assets would likely have been available to creditors at the time of the Debtor's petition, especially considering she allegedly had enough financial breathing room to send thousands of dollars to the Parks every month since 2016, six years before her filing.

- I'll first address the Debtor's failure under section 727(a)(5) to explain satisfactorily the depletion of funds received from the $184,000 Transfer.

  - The Debtor admits that she once had the funds from the $184,000 Transfer, but she testified that those funds were no longer in her possession at the time she filed for bankruptcy. Transcript of Hearing Held 1/8/25 [Docket No. 85] at 152:14–18. Thus, New Falls met its burden with respect to those funds.

  - New Falls's complaint sets out the Debtor's same explanation that she gave at trial for her dissipation of the funds. *See Complaint* ¶ 150. The Debtor initially explained that she used the money to pay for basic living expenses and paying off debts, including catching up on her mortgage, property taxes, and HOA fees. The Debtor didn't produce a single document to substantiate those payments.

  - Furthermore, when pressed by New Falls's counsel, the Debtor testified that she actually used a majority of the funds for gambling and paying off gambling debts, stating that she used "probably quite a bit of it" but couldn't "remember exactly" how much of the $184,000 she used for such a purpose. Transcript of Hearing Held 1/8/25 [Docket No. 85] at 173:25–174:12, 175:21–176:12.

o The Debtor's inconsistent testimony was not credible and was uncorroborated. Her vague statements that the money from the $184,000 Transfer was used for living expenses and to pay down her debts, followed by later statements that it was actually spent quite a bit on gambling, are not enough to explain satisfactorily the loss of assets, especially without any specific amounts paid or any documentation that shows her expenditures. *See Clark v. Wilbur (In re Wilbur)*, 211 B.R. 98, 101–02 (Bankr. M.D. Fla. 1997) (finding that the debtor's inconsistent testimony regarding funds he claimed were used to pay for living expenses and gifts was not satisfactory because there was no documentation to corroborate his testimony even though he gave specific amounts).

o Moreover, the only documentary evidence in the record on this issue contradicts the Debtor's testimony. Despite receiving $184,000 in July 2015, two assessment liens were placed on the Debtor's home for failure to pay her HOA fees in the months following her receipt: one in August 2015 and another in December 2015. The Debtor testified that she did eventually pay her HOA at some point but could not remember when; the only documentary evidence showing that the Debtor paid her HOA fees was the release of the August 2015 lien in 2019, a year in which the Debtor states she no longer lived at the property because it went for a short sale, which suggests that she was also still behind on her mortgage. Transcript of Hearing Held 1/8/25 [Docket No. 85] at 114:5–16.

o General assertions, made without documentary corroboration, that money was spent on living expenses or lost through gambling are not satisfactory. *First Tex. Sav. Ass'n v. Reed (In re Reed)*, 700 F.2d 986, 993 (5th Cir. 1983). No witness corroborated the Debtor's testimony regarding her disposition of the funds. The Court is left in the dark about what the Debtor did with the money received in the $184,000 Transfer.

o At trial, to emphasize that the Debtor no longer has the funds, the Debtor responded "no" when asked by her counsel whether she put the funds in a briefcase and buried it in her backyard. Transcript of Hearing Held 1/8/25 [Docket No. 85] at 152:11–13.

o Unfortunately, given the Debtor's general lack of credibility at trial, the Court believes it's just as likely that some portion of the funds are actually buried or hidden somewhere as it is that they were spent as the Debtor claims.

- Next, the Court will address the Debtor's failure under section 727(a)(5) to explain satisfactorily the loss of the Morgan Property.

  o The Debtor testified that she transferred the Morgan Property to satisfy a $20,000 debt she incurred from Jaemin Lee when she borrowed money from him to pay off gambling debts, a debt for which the Debtor purportedly used the Morgan Property as collateral.

  o Jaemin Lee and the Debtor provided inconsistent testimony regarding how they came to be in a debtor-creditor relationship.

    ▪ Mr. Lee testified that a "Mr. Chang" had contacted Mr. Lee to ask if he would be willing to loan someone money, after which Mr. Lee was contacted by the Debtor for the purpose of obtaining the loan.

    ▪ However, the Debtor testified that she got Jaemin Lee's phone number from a woman with whom she had acquainted gambling at high-limit tables.

    ▪ Only adding to the confusion is Peter Park's prior testimony that he knew Jaemin Lee's phone number because he used to work for the Fiesta Bazaar, only for Peter Park to say he must have been mistaken when he made that previous testimony.

  o Jaemin Lee's testimony may have somewhat tracked with the broad explanation for the purpose of his loan to the Debtor, but there was no underlying documentation substantiating the alleged debt—no signed note, no documented receipt of the funds, no deed of trust, and no foreclosure documents. Instead, the only evidence is a January 2017 quit-claim deed.

  o The Debtor also provided no detail or documentation about the underlying debts she allegedly paid with the Jaemin Lee loan proceeds, offering only a vague explanation that she was having personal issues that led to her needing to settle various gambling debts.

  o The Court is also troubled by the Debtor's explanation for why a property that the Debtor had listed in 2022 for over $650,000 was transferred only five years earlier to settle a $20,000 debt.

  o The Debtor did not provide an explanation that keeps the Court from having to wonder about the true story behind the 2017 Morgan-Property transfer. *See Brown v. Ferrari (In re Ferrari)*, 587 B.R. 504, 515 (Bankr.

N.D. Ill. 2018) (finding that the debtor's explanation about loans that destroyed the equity in his real property was unsatisfactory, "troubling[,] and unsubstantiated" because the loan transactions were all in cash, there was no evidence of the receipt of the funds, and there was no corroborating documentation that is usually produced and easily available).

- The Debtor needed to give an explanation that gave the Court credible contentment about what happened to the assets. *In re Reed*, 700 F.2d at 993. Because the Court is left to speculate about the Debtor's dispositions of the Morgan Property and the money received in the $184,000 Transfer, the Debtor is barred from discharge under section 727(a)(5).

- Next, the Court will explain why New Falls's remaining two allegations do not themselves satisfy section 727(a)(5).

  - New Falls alleges that the Debtor must explain the loss of $44,000 in income shown as "Costs of Labor" on her 2019, 2020, and 2021 tax returns.

    - The problem is that everyone knows where that income went. The parties stipulate that the Debtor paid these funds to her parents and children. Amended Joint Pre-Trial Order [Docket No. 60] at 9. The Debtor's accountant testified that the deduction was made based on his understanding that the Debtor paid the Parks for what was either support or services rendered. Transcript of Hearing Held 1/6/25 [Docket No. 83] at 82:6–24.

    - The Debtor sent thousands of dollars each month to her parents and then claimed a deduction for those payments as costs of labor on her tax returns. All parties are aware that the Debtor was making these payments. The fact that the deductions were false does not render the explanation about where the assets went unsatisfactory for purposes of section 727(a)(5).

  - New Falls also alleges that the Debtor failed to adequately explain the purpose of the Support Payments.

    - The Debtor testified that these payments were necessary to support her parents due to their financial difficulties after the failure of the Park Businesses. Sue Park corroborated the Debtor's testimony. This claim under section 727(a)(5) fails.

**2. The Court will next address the Plaintiff's claim under section 727(a)(4) of the Bankruptcy Code.**

> **a. The Debtor is barred from discharge under section 727(a)(4) because she lied about her gambling activity under oath.**

- Under 727(a)(4)(A), a debtor will be denied a discharge if she knowingly and fraudulently, in or in connection with the case, made a false oath or account that is material to the bankruptcy case. *In re Pratt*, 411 U.S. 561, 566 (5th Cir. 2005). In the Fifth Circuit, fraudulent intent is satisfied if the debtor's statement under oath is made with reckless indifference to the truth. *Sholdra v. Chilmark Fin. LLP (In re Sholdra)*, 249 F.3d 380, 382 (5th Cir. 2001); *The Cadle Co. v. Preston-Guenther (In re Guenther)*, 333 B.R. 759, 767 (Bankr. N.D. Tex. 2005) (Hale, J.).

- New Falls argues that the Debtor's discharge should be denied under 727(a)(4) because she lied in her section-341 meeting about whether she had gambled in 2019, 2020, 2021, or 2022. At that 341 meeting, the Debtor testified that she had not gambled since 2016.

  - Later, in a 2022 deposition, the Debtor admitted that she had gone on a family vacation to Las Vegas in 2019.

  - At trial, the Debtor testified that she suffered "not too much" in gambling losses on that trip. She insinuated that she lost around the same amount she won from a slot machine jackpot—around $2,000.

  - However, when confronted with her 2019 tax return on cross-examination, she confessed that her total gambling losses on that trip were actually $7,500. Since she filed for bankruptcy, the Debtor has continued to visit casinos and gamble on online casinos.

  - The Debtor's statement at the 341 meeting that she has not gambled since 2016 satisfies all the required elements of 727(a)(4). Her statement was made under oath. It was false—she gambled a significant amount of money in 2019 in Las Vegas. She knew this statement was false—the Debtor had the most intimate knowledge of her own personal affairs, including her gambling activity. She made the statement with fraudulent intent—her testimony that she simply forgot about the trip when she testified at the 341 meeting was not credible. It seems that the Debtor reveals new information about this trip each time she is pressed about it. Considering that pattern of dishonesty, the Court is satisfied

22

that the Debtor made the statement with at least a reckless indifference for the truth. Finally, the statement was material to the bankruptcy case. A central issue for the creditors in this case is what happened to the funds from the $184,000 Transfer. The Debtor claimed at trial that she used a lot of that money to pay back gambling debts. Thus, the Debtor's alleged gambling habits play a material role in her bankruptcy case. Creditors were entitled to an honest and straightforward answer about where the money went. They never got it.

### b. *New Falls's remaining arguments under section 727(a)(4) are not winners.*

- New Falls argues that the Debtor's discharge should be denied under 727(a)(4) because her tax returns provided to the trustee for the years 2017 through 2022 contained false statements. That the returns are false is not in dispute; the Debtor admitted at trial that the deduction for cost of labor she took in each of those years was not for cost of labor.

  - But false statements in tax returns filed with the IRS are not made in or in connection with the bankruptcy. *See, e.g.*, *Krohn v. Frommann (In re Frommann)*, 153 B.R. 113, 119 (Bankr. E.D.N.Y 1993); *Baron v. Klutcho (In re Klutcho)*, 338 B.R. 554, 568–69 (Bankr. S.D.N.Y. 2005). The Debtor's false tax returns are not grounds for the Court to deny the Debtor's discharge under 727(a)(4).

- New Falls also argues that the Debtor's discharge should be denied under 727(a)(4) because she claimed that her parents are her dependents in her schedules, 341 meeting, and deposition.

  - First, the Debtor did not claim her parents as dependents on her schedules. The only dependents she claimed on Schedule J were her two children. New Falls points to a statement the Debtor made in her SOFA that "parents depend on debtor for payment of living expenses, transportation, etc." But that was simply a response to the question of whether she had made any transfers outside the ordinary course within the two years before bankruptcy.

  - Second, there is no evidence in the record that the Debtor claimed her parents were her dependents at her 341 meeting.

  - Third, although the Debtor's parents are not her dependents, the Court is not convinced that she understood the technical legal meaning of

"dependent" at her prior deposition. Transcript of Hearing Held 1/8/25 [Docket No. 85] at 113:18–114:20. So, to the extent the Debtor claimed that her parents were her dependents in her deposition, New Falls has failed to prove that the Debtor knew that statement was false.

- Finally, New Falls argues that the Debtor's discharge should be denied under 727(a)(4) because she failed to disclose her interests in Image Building, Priority1, and Trinity River in her bankruptcy schedules. As mentioned earlier, the Court is not satisfied that these interests actually existed at the time the Debtor filed her schedules—a fact upon which the falsity of the Debtor's omission hinges. Thus, the Court finds that New Falls has not proven these omissions satisfy 727(a)(4).

### 3. Turning to section 727(a)(3), the Debtor is barred from discharge because her records are inadequate to ascertain her financial condition.

- New Falls further contends that the Debtor should be barred from discharge because she did not keep sufficient records to explain her financial condition.

- Section 727(a)(3) entitles debtors to a discharge unless "the debtor has . . . mutilated, falsified, or failed to keep or preserve any recorded information . . . from which the debtor's financial condition . . . might be ascertained, unless such . . . failure . . . was justified under all circumstances." 11 U.S.C. § 727(a)(3).

- The party objecting to discharge must establish the two elements under section 727(a)(3): (1) the Debtor failed to keep adequate books or records, and (2) such failure makes it impossible to ascertain the debtor's financial condition. *The Cadle Co. v. Duncan (In re Duncan)*, 562 F.3d 688, 697 (5th Cir. 2009).

- New Falls bears the initial burden of proving that the Debtor failed to keep adequate financial records and that this failure prevented New Falls from ascertaining her financial condition. *Robertson v. Dennis (In re Dennis)*, 330 F.3d 696, 703 (5th Cir. 2003).

- If New Falls satisfies this burden, the Debtor must prove that such failure is "justified under all circumstances." *Id.*; *see also Buescher v. First United Bank and Tr. (In re Buescher)*, 783 F.3d 302, 308 (5th Cir. 2015).

- The Court has "wide discretion" in those inquiries, and its determination is a finding of fact. *In re Dennis*, 330 F.3d at 703.

- "Full detail" or perfection is not required, but there should be written evidence that is "orderly made and preserved." *Goff v. Russell Co. (In re Goff)*, 495 F.2d 199, 201 (5th Cir. 1974); *see also Pher Partners v. Womble (In re Womble)*, 289 B.R. 836, 856 (Bankr. N.D. Tex. 2003), *aff'd sub nom. Womble v. Pher Partners*, 299 B.R. 810 (N.D. Tex. 2003), *aff'd sub nom. In re Womble*, 108 Fed. Appx. 993 (5th Cir. 2004).

- But courts and creditors shouldn't be left to speculate as to the financial history or condition of the Debtor or of her past transactions. *In re Duncan*, 562 F.3d at 697.

- The written evidence should be done with "substantial completeness and accuracy" and enable the Court and creditors to ascertain the "present and past financial condition" of the debtor. *In re Goff*, 495 F.2d at 201.

- The adequacy of the Debtor's records is determined on a case-by-case basis, with consideration including the "debtor's occupation, financial structure, education, experience, sophistication and any other circumstances that should be considered in the interest of justice." *In re Duncan*, 562 F.3d at 697; *see First United Bank & Tr. Co. v. Buescher (In re Buescher)*, 491 B.R. 419, 438–39 (Bankr. E.D. Tex. 2013), *subsequently aff'd*, 783 F.3d 302 (5th Cir. 2015).

  - Considering that the Debtor managed her father's businesses for approximately 20 years, *see* Transcript of Hearing Held 1/7/25 [Docket No. 84] at 24:8–17, and is a college graduate with a background in real estate, *see* Transcript of Hearing Held 1/8/25 [Docket No. 85] at 153:3–9, the Court considers the Debtor relatively sophisticated, so she should understand the need for accurate and adequate record keeping. *See W. Wire Works, Inc. v. Lawler (In re Lawler)*, 141 B.R. 425, 429 (B.A.P. 9th Cir. 1992) (finding that the debtor should understand the need to keep business and personal records because "she was personally involved in the operation of a business and was a licensed realtor").

- Notably, a trustee or a creditor need not prove any fraudulent intent by a debtor to deceive creditors; rather, mere negligence in failing to keep and produce records is sufficient to deny a debtor's discharge under 727(a)(3). *Lowry v. Croft (In re Croft)*, 500 B.R. 823, 855–56 (Bankr. W.D. Tex. 2013).

- How far back in time a court should look is case-specific. *Res-TX One, LLC v. Hawk (In re Hawk)*, 534 B.R. 697, 716 (Bankr. S.D. Tex. 2015). While a focus on the two years before the commencement of the case is common, numerous

cases have found inquiries beyond a two-year period to be warranted. *See, e.g.*, *id.*; *Lashinsky v. Link (In re Link)*, 664 B.R. 832, 858 (Bankr. N.D. Okla. 2024).

- In this case, New Falls claims that the Debtor: (1) provided false tax returns from 2017 to 2021 (*Complaint* ¶ 125); (2) failed to keep and provide accurate records of the transfer of the Morgan property (Amended Joint Pre-Trial Order [Docket No. 60] at 21); (3) failed to keep and provide accurate records regarding her assets and liabilities (Amended Joint Pre-Trial Order [Docket No. 60] at 21); (4) failed to disclose any documentation relating to her interest in Image Building, Priority1, Trinity River (*Complaint* ¶¶ 56, 128–29); (5) failed to keep sufficient records to explain how she covered the costs of supporting her parents and children (*Complaint* ¶ 127); and (6) failed to disclose her interest or position with Hanmi Realty (*Complaint* ¶ 130).

- New Falls claims such falsified and inadequate record-keeping prevents it from ascertaining the Debtor's financial condition. With respect to certain categories of documents, the Court agrees.

- The Debtor admits that she lied on her tax returns for 2019, 2020, 2021, and 2022. From 2019 to 2022, she deducted more than $40,000 yearly for "Cost of Labor" in her tax returns, which totaled over $160,000. The Debtor admitted that her tax returns were false and that she had no one working for her during those years. These supposedly ordinary and necessary business expenses were, in reality, money that was given to her parents for support. *See* Transcript of Hearing Held 1/8/25 [Docket No. 85] at 121:9–17. Moreover, the Debtor also falsely claimed the Parks were dependents on her tax returns even though her parents were not receiving more than half of their support from her. Amended Joint Pre-Trial Order [Docket No. 60] at 9; *see* 26 U.S.C. § 152(a)(2), (d)(1)(C) (to be a dependent, a "qualifying relative" must, among other things, receive more than one-half of their support from the taxpayer claiming them as a dependent).

  - Tax returns are "quintessential documents" in a personal bankruptcy. *In re Dennis*, 330 F.3d at 703. These tax returns were records that could assist New Falls in ascertaining the Debtor's financial condition. The admittedly false tax returns are insufficient to enable New Falls to ascertain the dissipation of the Debtor's assets and, together with the Debtor's other inadequate record-keeping, leave the Court and creditors to speculate about the Debtor's financial condition and past transactions. *See In re Frommann*, 153 B.R. at 118.

- The Debtor offered no explanation for the falsification of her tax returns, aside from the Debtor's counsel's assertion that creative tax returns are not uncommon in personal bankruptcies. Transcript of Hearing Held 1/8/25 [Docket No. 85] at 229:20–230:6. The Debtor's tax returns were not merely "creative." They were outright false.

- Similarly, the Debtor testified that she used the Morgan Property as collateral for a loan from Jaemin Lee to satisfy gambling debts. However, as discussed for section 727(a)(5), there is no documentation to substantiate that there was a loan from Jaemin Lee, that there was a foreclosure by Jaemin Lee, or that Jaemin Lee had any type of security interest in the Morgan Property. The Debtor, who has a background in real estate, testified that she had no such documents, and she offered no reasonable explanation for the failure to keep them.

- Given the totality of the facts of this case, the Debtor is ineligible for discharge under section 727(a)(3) given her falsification of and failure to maintain documents that would help the Court and creditors ascertain her financial condition and previous transactions. In the years leading to her filing, the Debtor participated in fraudulent transfers and had substantial assets disappear without a trace. These very issues are what led to her bankruptcy filing.

- The integrity of the bankruptcy process depends upon an adequate paper trail. *Neary v. Hughes (In re Hughes)*, 353 B.R. 486, 502 (Bankr. N.D. Tex. 2006), *aff'd sub nom. Hughes v. Neary*, 386 B.R. 624 (N.D. Tex. 2008), *aff'd sub nom. In re Hughes*, 309 Fed. Appx. 841 (5th Cir. 2009). But the Debtor's failure makes it impossible for creditors or the Court to ascertain the nature of her transactions or her financial condition with any sort of clarity. For the foregoing reasons, the Debtor is denied a discharge under section 727(a)(3).

- New Falls's remaining assertions under section 727(a)(3) are without merit.

  - New Falls failed to convince the Court that the Debtor had any active interest in Hanmi Realty, Priority1, and Trinity River to document.

  - The Debtor's failure to document her supposed interest in Image Building is justified because it is unclear whether the company was actively doing business and whether her husband even had any interest that she could be awarded.

  - Also, New Falls did not address at trial its contention that the Debtor failed to keep sufficient records to explain how she covered the costs of

supporting her parents and children. New Falls did not meet its burden on that issue.

o Next, the Debtor was justified in not disclosing her apparent position as President of Hanmi Realty because it is unclear whether the company was still active.

o Finally, New Falls appears to argue that the Debtor failed to maintain records of her disposition of the $184,000. For the section-727(a)(5) count, after New Falls showed that substantial assets existed that no longer exist, the Debtor had the burden to provide a satisfactory explanation—including corroborating documentation—for the depletion of the funds. She offered no documents into evidence to substantiate her unbelievable testimony. The Court's ruling on that count did not require the Court to find that the Debtor failed to keep records. They simply didn't appear at trial, for reasons unexplained.

▪ For the section-727(a)(3) count, however, New Falls had the burden to show that the Debtor failed to maintain records of how she spent the $184,000. New Falls never put on any evidence that it asked for these records in a document request (or otherwise) and never received them. And the Court cannot locate in the record any testimony from the Debtor that she doesn't have such records. New Falls therefore failed to meet its burden on this issue.

### 4. Finally, the Debtor is not barred from discharge under section 727(a)(2)(A) or (a)(2)(B).

• I will first address why New Falls did not prove the required elements for section 727(a)(2)(A).

o Section 727(a)(2)(A) will bar a debtor's discharge if "the debtor, with the intent to hinder, delay, or defraud a creditor . . . has transferred . . . or concealed . . . property of the debtor within one year before the date of the filing of the petition." 11 U.S.C. § 727(a)(2)(A).

o Section 727(a)(2)(A) has four elements: (1) a transfer or concealment of property; (2) belonging to the debtor; (3) within one year of the filing of the petition; (4) with intent to hinder, delay, or defraud a creditor or officer of the estate. *In re Dennis*, 330 F.3d at 701.

o New Falls argues that the Support Payments the Debtor made to her parents satisfy section 727(a)(2)(A).

- o For the Support Payments made before the one-year period preceding the bankruptcy, New Falls relies on the continuing-concealment doctrine. Under that doctrine, the concealment of an asset that starts before, but continues into, the one-year-lookback period is within the reach of section 727(a)(2)(A). *Thibodeaux v. Oliver (In re Oliver)*, 819 F.2d 550, 555 (5th Cir. 1987).

    - ▪ The doctrine is satisfied by showing a transfer of title *and* the Debtor's retention of beneficial ownership into the one-year period. *Id.* at 553; *Fed. Deposit Ins. Corp. v. Sullivan (In re Sullivan)*, 204 B.R. 919, 939 (Bankr. N.D. Tex. 1997). Because New Falls did not prove that the Debtor retained beneficial ownership in the cash she transferred to her parents, it failed to show that the Debtor concealed the cash, and thus those transfers do not satisfy section 727(a)(2)(A).

- o For all the prepetition Support Payments, including those made within the one-year period, the Court is comfortable that the Debtor intended to support her parents, not to hinder, delay, or defraud her creditors. Though several badges of fraud are present, the transfers are in line with support payments from a child to her parents—which will almost always be to insiders and for less than reasonably equivalent value. The Court also finds it unlikely that the Debtor would try to avoid her creditors by sending her money to her parents—who are both jointly and severally liable with the Debtor to New Falls for over $400,000.

- o There is conflicting evidence over whether the Parks truly needed the monthly payments from their daughter to survive. Ultimately, the issue is not a deal-breaker. The evidence suggested that children supporting their parents in older age is not uncommon, especially in Korean culture, even where the parents don't absolutely need the money to survive. *See* Transcript of Hearing Held 1/8/25 [Docket No. 85] at 154:20–155:17.

- o For those reasons, none of the Support Transfers satisfy section 727(a)(2)(A).

- o If there were other undisclosed transfers that occurred within the one-year period preceding the Debtor's bankruptcy, they are not reflected in the record. To the extent that any additional undisclosed transfers were reflected in the record, there is insufficient evidence to prove they satisfy section 727(a)(2)(A).

- I will next address why New Falls did not prove the required elements for section 727(a)(2)(B).

  o Section 727(a)(2)(B) is identical to section 727(a)(2)(A) but applies instead to a debtor's postpetition transfer or concealment of property of the estate. 11 U.S.C. § 727(a)(2)(B).

  o New Falls first argues that the Debtor's concealment of her alleged ownership interest in the Morgan Property satisfies the requirements of section 727(a)(2)(B). This argument requires the Court to find that the Morgan Property is property of the estate. But the Court will not decide that threshold issue for two reasons.

    ▪ First, New Falls does not have standing to seek a determination that the Morgan Property is property of the estate. *See* 11 U.S.C. § 704(a)(1); *Reed v. Cooper (In re Cooper)*, 405 B.R. 801, 812–14 (Bankr. N.D. Tex. 2009).

    ▪ Second, even if New Falls had standing, Eun Joo Jun—the current record owner of the property—is not a defendant to this adversary proceeding, and the Court is not confident that she was properly apprised of the claims that would disturb her claimed interest in the Morgan Property. Deciding the issue under these circumstances poses due process problems. *See Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950).

  o New Falls next argues that the Support Payments the Debtor made to her parents after the petition date satisfies the requirements of section 727(a)(2)(B). This argument fails for the same reasons discussed above regarding the Debtor's prepetition Support Payments. The Court finds that the Debtor's postpetition Support Payments were not intended to hinder, delay, or defraud a creditor or officer of the estate and therefore do not satisfy section 727(a)(2)(B).

  o New Falls next argues that the Debtor's failure to disclose her interests in Image Building, Priority1, Trinity River, and Hanmi Realty in her bankruptcy schedules satisfies the requirements of section 727(a)(2)(B). However, the evidence is insufficient to establish that these interests existed at the time the Debtor filed her schedules. Based on the evidence presented to the Court, the Debtor's interest in these entities is largely speculative.

30

## VI.  Conclusion

- The Debtor is barred from discharge under 11 U.S.C. § 727(a)(5), (a)(4), and (a)(3). The Plaintiff's section-523 counts are moot because there is no discharge from which to except a debt. All other relief requested by the parties is denied. The Court will enter a separate Final Judgment.

### End of Memorandum ###